UNITED STATES of America, Plaintiff,

v.

**Richard BAILEY, Defendant.**

**No. 94 CR 481.**

United States District Court,
N.D. Illinois,
Eastern Division.

June 6, 1995.

Opinion Supplementing Decision
June 15, 1995.

Second Opinion Supplementing
Decision June 19, 1995.

Steven Miller and Ronald Safer, Asst. U.S. Attys., Chicago, IL, for plaintiff.

Patrick Tuite, Arnstein & Lehr, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

There is a good deal of anecdotal evidence to suggest that the large majority of federal district judges, regardless of their respective ideological bents, view the Sentencing Guidelines ("Guidelines") regime as having done substantial damage to the "justice" component of our criminal justice system. This Court is unaware of any like reports as to the views of the federal judiciary at the appellate level. But if it were to turn out that either the just-stated perspective or the comparative numbers in those appellate courts were in fact materially different from those of judges at the trial court level, any such difference might well be attributable (at least in part) to the fact that a judge's not having to impose sentences in person may make it easier to accept or even to approve a mechanistic grid-dominated system—a system in which any differentials in sentencing tend to be based only on differences in crimes and not on any differences among the criminals who commit those crimes.

But no individual case such as this can provide an appropriate occasion for venturing into an extended examination of the philosophical support or lack of support for the Guidelines method. It is enough for present purposes to say that both the proponents and the opponents of the system agree that it has dramatically changed the landscape that defines the appropriate sentences for criminal defendants. And this case is truly unique in that respect, for in order to establish the appropriate Guidelines range here:

1. This case requires a federal court and *not* a state court to determine whether a defendant is guilty or not guilty of having solicited murder (in this instance, the murder of Helen Vorhees Brach).

2. This case also requires that determination to be made by a judge and *not* by a jury.

3. And this case requires that determination to be made by a preponderance of the evidence and *not* beyond a reasonable doubt.

Following an evidentiary hearing and an allocution proceeding that together have occupied the best part of fully 10 court days, this Court has indeed made that determination. But before this opinion turns to the subject of the claimed Brach murder, it will address both (1) the Guidelines calculation on the charges in the indictment that defendant Richard Bailey ("Bailey") and his counsel *have not* disputed and (2) the non-murder-related aspects of the Guidelines calculation that Bailey and his counsel *have* disputed—in other words, all of the aspects that could enter into the Guidelines calculation whichever way this Court were to rule on the murder-solicitation issue. This opinion's references to the evidence adduced during the hearing are intended to be exemplary only and not by any means all-inclusive: In every instance this Court has considered and evaluated all of the evidence, and not just the portions that are mentioned here.[1]

### Base Offense Level

For the reasons that have been set out in the thorough presentence investigation report ("PSI") prepared by Probation Officer Elisa Ehrlich, the base offense level for Bailey's RICO offenses (other than his alleged involvement in the Brach murder) is dictated by Guideline § 2E1.1(a). Taking into account the financial extent of the RICO-linked offenses to which Bailey has pleaded guilty, the PSI calculated that base offense level to be 19. That determination was not challenged by Bailey (see page 2 of his counsel's May 17, 1995 letter ("May 17 Letter")).

However, in then responding on June 1 to the Government's Sentencing Memorandum, the reply memorandum ("R.Mem.") filed by Bailey's counsel correctly pointed out at pages 8–9 an error in the PSI's calculations by its having failed to group the several counts charging money laundering together with all of the other counts. It is plain that although the numerous counts to which Bailey has pleaded guilty do bear different la-

---

1. Of course the evidence that *is* mentioned in this opinion reflects findings by this Court based on a preponderance of the evidence, and it necessarily indicates this Court's rejection of contrary evidence.

bels and are covered by different sections of the Criminal Code, all of them stem from the same course of conduct within the operative rules established by Guideline § 3D.1. This Court has therefore disagreed with and accordingly rejects the PSI's proposed 2–level addition arising out of the Probation Officer's suggested division of the charges into two different groups.

In turn, the government's most recent submission has pointed out—also correctly—that RICO Guideline § 2E1.1(a) sets the base offense level at the *greater* of level 19 and "the offense level applicable to the underlying racketeering activity," which in this instance would be the base offense level of 21 for the substantive money laundering counts (Guideline § 2S1.1). That has sent all of us back to the books, in consequence of which everyone has agreed that the teaching of Application Note 1 to Guideline § 2E1.1 is that if any one or more of the applicable increases in offense level would apply to the charged conduct other than money laundering but *not* to the money laundering as such, the 2–level difference between the former charges (a 19 level) and the latter charges (a 21 level) would become nonmaterial, for the former (as adjusted upward) would control. And as the ensuing discussion reflects, that is clearly the case.

Accordingly this exercise has returned us to the point of beginning, and the relevant base offense level is indeed 19 (albeit for reasons different from those stated in the PSI). It is from that point that this Court must apply any adjustments upward or downward, the subject to which this opinion now turns.

*Guideline § 3A1.1: Vulnerable Victim*

■ Guideline § 3A1.1 provides:

If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by 2 levels.

May 17 Letter 1 seeks to avoid such an increase by quoting this excerpt from *United States v. Sutherland,* 955 F.2d 25, 26 (7th Cir.1992) (citations omitted):

In a fraud case where the defendant issues an appeal to a broad group the court should focus on whom the defendant targets, not on whom his solicitation happens to defraud.... § 3A1.1 is designed to punish criminals who *choose* vulnerable victims, not criminals who target a broad group which may include some vulnerable victims.

That notion continues to be relied upon by Bailey's counsel in their discussion of that and other cases at R.Mem. 1–3.

But any such attempted reliance is surprising, for the just-quoted analysis in *Sutherland* inculpates rather than exculpates Bailey. Defense counsel's invocation of *Sutherland* wholly ignores Bailey's deliberate focus on sometimes older, but always vulnerable, wealthy women as his "marks" or "pigeons"—preferably women who were recently widowed or divorced and were therefore presumptively more susceptible to his efforts at wooing them.[2] In addition to the tragic Linda Holmwood ("Holmwood"), whom Bailey left near-destitute after having romanced her and having taken advantage of her tendency toward alcoholism to defraud her, and the distressing saga of the Bailey-engineered extensive frauds perpetrated on Carole Karstenson ("Karstenson") when she was exceptionally vulnerable (she was actually under a doctor-confirmed death sentence, a diagnosis from which she was later almost miraculously reprieved), the record discloses a whole series of Bailey's other frauds (including his extensive use of lonely hearts ads), all of them calculated to locate and take financial advantage of other women who fit the profile of vulnerability that Bailey considered as

---

**2.** It would unduly lengthen this opinion to provide chapter and verse on the wide-ranging conspiracy in which Bailey was one of the principal players. Although this Court rarely refers to a party's submission for a statement of its factual findings, in this instance Bailey has acknowl-

edged the accuracy of the government's 93–page *Santiago* proffer in all respects except for the few that Bailey has expressly identified as in dispute. That document amplifies, as well as amply supporting, what is set out in this opinion.

making for especially easy marks.[3] Bailey's cynical comments about finding it possible to sleep with elderly women by thinking only about the money to be made from them[4] were all of a piece with that deliberate targeting of especially vulnerable victims.[5]

More than once during the hearing witnesses made mention of the well-known con man of another era, Yellow Kid Weil,[6] to whom Bailey was said to have referred as his role model. When Bailey came to the stand, he denied that—a denial that this Court finds to have been another instance of Bailey's mindset hereafter referred to in n. 9. This was plainly no more than a marginally collateral matter, yet Bailey felt compelled to deny the assertion—a denial that this Court finds lacking in credibility. In any event, Weil (whose name was once a byword representing the classic con man) often described himself as never having conned anyone who didn't have a bit of larceny in his own heart. Although that observation may help to explain the success of (rather than to justify) many confidence schemes (or even many Ponzi schemes), Bailey's selection of his especially vulnerable victims did not share that characteristic. Bailey's conduct was even more cynical and more worthy of the censure represented by the Guideline § 3A1.1 enhancement (see *United States v. Lallemand,*

989 F.2d 936, 940 (7th Cir.1993) (that "guideline's other purpose, the moralistic, is to express society's outrage at criminals who unsportingly prey on the weak, the defenseless")).

In sum, Bailey is an especially appropriate candidate for the Guideline § 3A1.1 increase (see, in addition to *Lallemand,* the quoted *Sutherland* reference to "criminals who *choose* vulnerable victims"—an apt description of Bailey). This Court approves that increase.

*Guideline § 3B1.3: Abuse of Private Trust*

■ Guideline § 3B1.3 provides:

If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based upon an abuse of a position of trust, if may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an

3. It will not do for Bailey to point to the fact that many of his victims were middle-aged rather than elderly, or to the general publication of the lonely hearts ads, as "target[ing] a broad group" within the meaning of *Sutherland.* What is instead significant is Bailey's selection of the most likely (because most vulnerable) targets from among the ads' respondents, just as the women who were identified as wealthy and either divorced or widowed were targeted as Bailey's potential "pigeons" from among those coming to the stables for any reason. It is the persons whom Bailey then selected as the most promising marks for his scams that informs the decision as to the applicability of Guideline § 3A1.1.

4. One witness described Bailey as responding to the witness' question as to how he could sleep with women as old as Brach (she was nearly 18 years older than Bailey—at the time of her disappearance she was 65, while Bailey was 47) by saying "I close my eyes and think about the money." Indeed, the government's *Santiago* proffer described a whole series of crude—even more crude—statements by Bailey about his engaging in sexual relations with older women (including Brach) as an integral part of his fraud-

ulent activities. Those additional witnesses who were referred to in that proffer as being prepared to testify to those statements during the originally anticipated 10 to 12 week trial were not among the smaller parade that came to the stand during the two-week sentencing hearing, but their testimony was not part of the limited matters that Bailey disputed. In any event, this Court credits that evidence.

5. As this opinion later discusses under *Acceptance of Responsibility,* during his testimony Bailey disclaimed just about everything that has been stated in the just-concluded paragraph of the text. This Court discredits Bailey's disavowals in all those respects, finding the evidence in support of the just-summarized findings to be entirely credible.

6. One of the witnesses got Weil's name comically wrong—as something like "Wildcat Kelly." Ah well, fame (or notoriety) is fleeting—as Marcus Aurelius put it (Meditations IV, 33):

All is ephemeral—fame and the famous as well.

adjustment under § 3B1.1 (Aggravating Role).

Interestingly, both the government and Bailey cite *United States v. Brown*, 47 F.3d 198 (7th Cir.1995) in support of their competing arguments that Bailey did or did not engage in conduct triggering that 2–level increase.

It is clear that Bailey obtained and then betrayed a fiduciary relationship with a number of his victims. For example, one of his varied types of fraudulent schemes involved what purported to be a purchase of a horse that Bailey was supposedly already committed to "purchase" from someone who was actually a confederate (with the victim having been told that she and Bailey would later divide the proceeds of the prospective resale of the horse, which was falsely represented to be much more valuable than even the original fictitiously-rigged and inflated "sale" price). After the so-called purchase was completed, Bailey's check (purportedly his share of the "purchase" price) would be torn up and Bailey and his confederate would divide up the victim's money. That and other schemes involving a partnership-type fiduciary relationship (with Bailey being the "partner" who was supposedly acting for both himself and the victims in dealing with the purported sellers) were closely linked with the vast disparity in the knowledge and understanding as between the perpetrator (Bailey) and the victim of the fraud (Bailey's "pigeon"), thus causing the victim to rely on Bailey's superior knowledge—a type of disparity that was held to support the abuse-of-trust enhancement in *United States v. Alex Janows & Co.*, 2 F.3d 716, 722 (7th Cir.1993).

In another several-times-played variation on the fraud theme, Bailey would falsely represent to a victim that he had contracted to purchase horses and would lose his down payment if he did not complete the deal on the set closing date. That was the predicate for his extracting a short-term "loan" from the victim that Bailey would collateralize with the horses. Bailey would then "default," and the victim would unwittingly become the owner of worthless horses, consequently subjecting the victim to further cash outlays for boarding bills. Then Bailey and his confederates—for there had never really

been a contract for Bailey's purchase of horses—would split the victim's money. Again *Alex Janows* would call for an abuse-of-trust enhancement under those circumstances.

May 17 Letter 1–2 attempts to place this case instead into the category described in *Brown*, where the relationship between the defrauder and the defrauded party merely provided the culprit with an opportunity that could easily have been afforded to persons other than the victim. But *Brown*, 47 F.3d at 205–06 characterized the latter kind of relationship as arms-length, while here Bailey expressly agreed with victims such as Karstenson, Kit Moss and Vivian Hurwith (and sought to do so with Barbara Morris) that he would act *for them* in the classic agent or alter-ego relationship that *Brown*, *id.* at 206 (quoting *United States v. Ashman*, 979 F.2d 469, 478 (7th Cir.1992)) said *would* qualify under Guideline § 3B1.1.

■ Nor does the application of that Guideline in the circumstances of this case involve double counting, as explained in *United States v. Haines*, 32 F.3d 290, 293 (7th Cir.1994):

> The facts in this record are sufficient to support each adjustment. Furthermore, the district court did not "draw from the same well" when imposing the upward adjustments. One adjustment focuses on the victim, who was demonstrated to be vulnerable. The other adjustment looks to the conduct of the offender, who abused a position of trust.

Accordingly this Court also approves the Guideline § 3B1.1 2–level increase. In that respect it rejects the PSI's recommendation to the contrary.

*Guideline § 3B1.1: Leader or Organizer*

Guideline § 3B1.1 provides in part:

Based on the defendant's role in the offense, increase the offense level as follows:

> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

Government's Sentencing Memorandum ("G. Mem.") 8–9 both (1) explains that Bailey need not have been the highest-ranking per-

son in the criminal enterprise to qualify for that enhancement (see, e.g., *United States v. Hogan,* 54 F.3d 336 (7th Cir.1995)) and (2) lists the numerous participants in the fraudulent scheme whom Bailey either employed or controlled or supervised (or a combination of those things). Nothing in the May 17 Letter disputes either of those assertions.[7] Nor does Bailey's R. Mem. raise any question in either respect—indeed, its conclusion (R.Mem. 9) presupposes the 4–level increase for leadership. Accordingly this Court approves the PSI's recommendation for that 4–level increase.

*Upward Departure*

*Guideline §§ 2F1.1 and 5K2.3*

■ G.Mem. 9–14 is the longest single subsection of the United States' presentation, focusing on the interaction of Application Note 10(c) to Guideline § 2F1.1 with Guideline § 5K2.3:

2F1.1 Application Note 10.

In cases in which the loss determined under subsection (b)(1) does not fully capture the harmfulness and seriousness of the conduct, an upward departure may be warranted. Examples may include the following:

\* \* \* \* \* \*

(c) the offense caused reasonably foreseeable, physical or psychological harm or severe emotional trauma.

\* \* \* \* \* \*

5K2.3.

If a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense, the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the severity of the psychological injury and the extent to which the injury was intended or knowingly risked.

Normally, psychological injury would be sufficiently severe to warrant application of this adjustment only when there is a substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous duration, and when the impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns. The court should consider the extent to which such harm was likely, given the nature of the defendant's conduct.

It can scarcely be gainsaid that the situation portrayed by the evidentiary hearing fits the first of those provisions,[8] so the discussion here will focus on the second.

Two issues remain for consideration in that respect. First, given the egregious nature of Bailey's conduct in defrauding various of his victims such as Holmwood and Karstenson (to choose the most outrageous instances presented to this Court), was the actually-sustained psychological injury "much more serious than that normally resulting from commission of the offense"? Second, would a departure on that ground, when linked with the already-discussed upward adjustments under Guideline §§ 3A1.1 and 3B1.3, amount to double counting?

As for the first of those questions, G.Mem. 9 properly acknowledges that "it is difficult to define the injury normally resulting from mail fraud." That Memorandum then quotes

---

7. May 17 Letter 2 really acknowledges the matter by stating (emphasis added):

   Because of the unique nature of RICO the government was able to go back 20 years and have an offense level starting at 19 *and then adding points for his role in the offense.*

8. Because of Bailey's guilty plea, the overall evidentiary presentation during the sentencing hearing was much shorter than would have been the case during the originally-anticipated 2½ to 3 month trial. Matters referred to in the Government's *Santiago* proffer—which Bailey has

agreed are to be treated as evidence for sentencing purposes, except for the limited matters that his counsel identified as in dispute—indicated (1) that the situations described in the text represented only some particularly distressing examples of Bailey's callousness (which had been exhibited earlier during his fraudulent operation of a driving school, something that had also involved the victimization of vulnerable women) and (2) that the repeated imposition of psychological injury in the frauds charged in the indictment had to be foreseeable to Bailey.

*United States v. Pelkey*, 29 F.3d 11, 16 (1st Cir.1994):

> Some degree of consequential trust and reliance by the victim is to be expected in the majority of fraud cases involving false pretenses, and the presence of such reliance will not generally justify departure.

But the government's ensuing recapitulation of Bailey's depredations and their impact on Holmwood and Karstenson are graphic illustrations of the fact that (to paraphrase *Animal Farm*) some frauds and their consequent psychological injuries are more equal than others. Nothing that Bailey's R.Mem. 4 says as to those Guideline provisions (or as to *Pelkey*) diminishes the force of that conclusion.

■ What is more troublesome is the second question of possible double counting. G.Mem. 12–13 cites to and quotes from three Courts of Appeals decisions elsewhere (*United States v. Astorri*, 923 F.2d 1052, 1055, 1058–59 (3d Cir.1991); *United States v. Mandel*, 991 F.2d 55, 56, 58–59 (2d Cir.1993) and *United States v. Haggard*, 41 F.3d 1320, 1327 (9th Cir.1994)) to negate the duplicative impact of a Guideline § 3A1.1 vulnerable-victim adjustment if coupled with the type of upward departure now under discussion. As *Haggard, id.* (citing *Astorri*) puts it:

> The two provisions in question account for different aspects of the defendant's criminal conduct. One section focuses on the psychological harm the defendant caused the victim. See U.S.S.G. § 5K2.3. The other section accounts for the defendant's choice of victims; it meets [sic] out extra punishment for defendants who prey on unusually vulnerable victims. See U.S.S.G. § 3A1.1. There was no double counting.

Neither *Haggard* nor *Astorri* (nor *Mandel*, which held open the prospect on remand of an upward departure for psychological harm) also involved the further Guideline § 3B1.3 abuse-of-trust increase that this Court has approved here. As reprehensible as Bailey's conduct was, this Court retains the concerns that led the panel in *United States v. Kopshever*, 6 F.3d 1218, 1224 (7th Cir.1993), to say after describing Guideline §§ 3A1.1 and 5K2.3 (with this Court sitting by designation and acting as the spokesman for the panel):

> But the unquestioned flaw in the sentence imposed below was that the district court really drew from the same well in setting out the considerations for application of the "unusually vulnerable victim" factor and in justifying the departure upward for unusually serious psychological injury— and he did so without the type of factual hearing that is required to make determinations on contested issues. Even apart from the thinness of factual support for the grounds purportedly justifying the departure, the procedure followed below runs afoul of our recent explanation of the concept of "double counting" in *Lallemand*, 989 F.2d at 939–40. Indeed, the same conclusion was reached recently by the Second Circuit in a strikingly similar situation in *United States v. Mandel*, 991 F.2d 55, 58–59 (2d Cir.1993). Accordingly, on remand the district court will not be free to depart upward based on the factor of an unusually serious psychological injury—at least in the absence of a very different type of factual record from that before us.

But on balance this Court has determined that the added ingredient of unusually serious psychological injury was in fact present in more than ample supply as to more than one of Bailey's victims in this case. And as was true in *Haines*, 32 F.3d at 290, that factor makes this case very different from the situation that was dealt with in *Kopshever*. That element of serious psychological injury alone supports an upward departure that is of some magnitude, for that factor is not adequately addressed by the already-ruled-upon Guideline adjustments.

*Guideline § 5K2.8*

■ Here is still another ground for upward departure that is urged by the government (Guideline § 5K2.8):

> If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation.

Because only a single departure upward will be ordered in this case in any event, the problem of potential double counting is not posed as to that contention in the same way that has already been discussed with respect to the adjustments in the offense level. Instead this potential added element plays a different role in this case: For sentencing purposes it is worth examining in how many different ways a defendant's conduct fits the Guidelines that identify the possible grounds for upward departure—an examination that can provide guidance in deciding upon the magnitude of that departure.

In this instance Bailey's conduct certainly rose (or more accurately fell) to the "unusually cruel" and "unusually degrading" levels referred to in Guideline § 5K2.8. Although an already-married man, Bailey concealed that fact from the targets of his fraud, routinely leading them to believe that he cared for them deeply and proposing marriage to at least three of his victims.[9] It is scarcely surprising that Bailey's callousness in then thrusting the victims aside after he had gained *his* goal—mulcting them of their money—had a devastating impact on them. And it does not represent double counting to point again to the Holmwood and Karstenson episodes as illustrative of the "unusually cruel" conduct by Bailey that was "unusually degrading" to each of them.

*Guideline § 2F1.1: Knowing Endangerment of Solvency*

■ Application Note 10(f) to Guideline § 2F1.1 reads:

> In cases in which the loss determined under subsection (b)(1) does not fully capture the harmfulness and seriousness of the conduct, an upward departure may be warranted. Examples may include the following:
>
> *      *      *      *      *      *

(f) the offense involved the knowing endangerment of the solvency of one or more victims.

Again the Holmwood and Karstenson episodes unquestionably support the application of that ground. Here is the wholly accurate G.Mem. 17–18 in that respect:

> Once again, defendant's crime against Linda Holmwood justifies a departure on this ground. Bailey took everything that Linda Holmwood had. When they met, Holmwood lived in a large, furnished house in Naperville. After Bailey defrauded her, Holmwood was without money, without a house, without furniture, without any assets, in a destitute condition, and on public aid. When he had taken all of her money, he abandoned her, taking even the horses that she believed she had purchased. To say that Bailey knowingly endangered Linda Holmwood's solvency is an understatement.
>
> In addition, Carole Karstenson's solvency was threatened by Bailey's crime. Karstenson's husband had left her a substantial sum of money. Bailey and Brown defrauded her out of the bulk of that money. Furthermore, Bailey attempted to have Karstenson sign a power of attorney when Karstenson was no longer physically able to attend to her own affairs. There can be little question that this would have resulted in transferring the remainder of Karstenson's wealth to Bailey.

As before, this Court discredits Bailey's testimony to the contrary, and it likewise rejects the R.Mem. 5 argument on that score.

*Upward Departure Summary*

■ *Hogan,* 54 F.3d at 342 has again made it plain that in announcing any departure from the Guidelines "a district court must 'link the extent of departure to the structure of the guidelines'" (quoting *United States v. Ferra,* 900 F.2d 1057, 1062 (7th Cir.1990)). That linkage involves a compari-

---

**9.** Here too Bailey denied what the credible evidence plainly established: In this instance he claimed that he never proposed marriage to any of his victims. It is hard to fathom Bailey's mindset, under which he finds it possible to acknowledge having cheated his victims financially but he denies the real extent to which, and the manner in which, he preyed on their individual vulnerability as women (both by disclaiming the proposals of marriage and by minimizing the nature of his wooing efforts). But here too, as with the matters referred to in n. 5 and elsewhere in this opinion, this Court discredits Bailey's testimony.

son of the seriousness of the aggravating factors present in the case with those that have been considered by the Sentencing Commission (*id.*). To be sure, there is no precise mathematical formula for quantifying the amount of departure, but what has already been said in this *Upward Departure* section points the way.

■■■ This opinion has found that three separate bases exist for an upward departure with respect to Bailey's protracted series of criminal frauds. Though all three bases of course stem from the identical factual matrix, the very circumstance that those facts implicate several categories that the Guidelines view as serious grounds for departure helps to inform the appropriate level of enhancement.

This Court views each of the three factors as essentially comparable to the earlier-discussed adjustments for vulnerable victim and abuse of trust—that is, as justifying a 2–level adjustment if any of those aggravating factors were the only one present. However, any straight-out additive aggregation of three separate 2–level increases would materially overstate matters—not in terms of literal double counting as such, but because the several factors have the degree of interrelationship that has been spoken of earlier in this opinion. Accordingly this Court will apply half of that maximum potential, or a 3–level upward departure.

### Acceptance of Responsibility

■■■ *United States v. Jones*, 52 F.3d 697 (7th Cir.1995) sets out a recent articulation of the principles that enter into a determination of whether a defendant has "clearly demonstrated acceptance of responsibility for his offense" (Guideline § 3E1.1(a)). It is not enough for a defendant simply to admit his or her guilt to the scheme charged in the indictment (*Jones* at 701; *United States v. Panadero*, 7 F.3d 691, 694 (7th Cir.1993)). And this opinion has already identified a congeries of ways in which Bailey has sought to minimize his culpability through false sworn testimony. That is more egregious than the situation in the numerous cases cited in *Jones* at 701, each of which affirmed denials of the credit for acceptance of respon-

sibility. Bailey too has forfeited any entitlement to such a credit.

### Calculation of the Non–Brach– Related Guideline

Starting with the earlier-discussed base offense level of 19, the Guidelines call for two increases of 2 levels each (Guideline §§ 3A1.1 and 3B1.3), an undisputed 4–level increase under Guideline § 3B1.1 and a 3–level upward departure under the combination of Application Notes 10(c) and 10(f) to Guideline § 2F1.1 with Guideline §§ 5K2.3 and 5K2.8. When coupled with the denial of any acceptance-of-responsibility credit, that calculation produces an aggregate offense level of 30.

■■■ Finally, this Court examines the government's additional argument that Bailey's criminal history should be adjusted upward from level I pursuant to the policy statement in Guideline § 4A1.3. Bailey's counsel respond (R.Mem. 7–8) that:

1. Because the indictment sounds in RICO, the operative rules permit the inclusion for Guideline purposes of criminal conduct going back many years—including years that would be outlawed by limitations if made the subject of substantive charges.

2. Relatedly, if those aspects of Bailey's conduct set out as racketeering acts in implementation of the RICO conspiracy *had* been charged as substantive offenses before they were barred by limitations, they might well have been too old to count in Bailey's criminal history points (see Guideline § 4A1.2(e)).

But that approach misses entirely (or at least seriously deflects from) the principle that underpins Guideline § 4A1.3. First of all, the base offense level of 19 under RICO would have been applicable even if Bailey's depredations had been far less extensive and prolonged. More importantly, if the scenario just stated in paragraph 2 *had* taken place, the very Guideline to which Bailey's counsel point still would have called for consideration of an upward departure (Application Note 8 to Guideline § 4A1.2). But most significantly, even considering the broad sweep of conduct and the extended time span of Bailey's

offenses encompassed within the current indictment, Bailey is plainly what this Court's colleague Honorable William Hart colloquially refers to as a "first caughter" rather than a first offender. As with most con men (a type of crime that carries an extraordinarily high degree of recidivism), Bailey's fraudulent activities neither began nor ended with his involvement in the horse industry that forms the basis of his present conviction:

1. Testimony during the hearing and evidence in the *Santiago* proffer demonstrated that before Bailey was forced out of his earlier operation of his A–1 Driving School in 1970 by the Illinois Attorney General's office, his modus operandi had involved the same kind of multiple-victim fraud to which he has pleaded guilty here. Though no criminal indictment or conviction resulted from those frauds, Guideline § 4A1.3(e) specifies that activity as a potential basis for upward departure on criminal history grounds.

2. As the government's final witness during its case in chief testified, in the latter part of 1993—after the events charged in the indictment—Bailey took advantage of a woman friend of his family by obtaining a $25,000 loan that he said would be repaid within a month. Then nearly eight months later (no repayment having been made) he extracted another $10,000 from the victim by giving her the false impression that it would enable him to make good on the original amount. By way of aggravation, Bailey had been told by the victim that she had to take funds from her retirement savings to make the two loans. This Court finds that Bailey did not intend to make repayment as he promised when he obtained the funds,[10] so that the transactions were fraudulent in their inception.[11]

10. Bailey likewise testified falsely during the hearing that he had intended from the beginning to repay money that he obtained from several victims of the other fraudulent activity charged in the indictment.

11. Bailey's position is that but for his imprisonment on the current charges he would have repaid the loans (his attorney so wrote the victim in December 1994). But that does not explain

In sum, this Court finds that the level I criminal history category "significantly underrepresents the seriousness of [Bailey's] criminal history" (Guideline § 4A1.3) and that his real-world criminal history (though not evidenced by prior convictions) is "significantly more serious than that of most defendants in the same criminal history category" (*id.*). Any single prior sentence that would have been imposed for the types of other offenses committed by Bailey would surely have included a custodial term that would trigger a 3–point increase for purposes of setting his criminal history category (see Guideline § 4A1.1(a))—and it is appropriate to make an adjustment of that magnitude here (see *United States v. Chong Tai*, 41 F.3d 1170, 1176–78 (7th Cir.1994)), moving Bailey from Category I to Category II. This Court so rules.

Accordingly, all of the factors that have been discussed in this opinion to this point establish an offense level of 30 and a criminal history category of II. That sets a guideline range of 108 to 135 months, irrespective of the decision reached by this Court on the Brach matter. This opinion now turns to that subject.

### Brach–Related Offense

■ Not by way of a separate count that directly charges any murder-related offense, but rather as one of the overt racketeering acts assertedly committed in furtherance of the RICO conspiracy charged in Count Two, paragraph 37 of that count alleges:

In 1977, RICHARD BAILEY and co-schemer A [who has now been identified in the course of the sentencing proceedings as Frank Jayne, Jr. ("Jayne")], conspired to murder and solicited the murder of Helen Brach, in violation of Illinois Revised Statutes, Chapter 38, Sections 8–1 and 8–2.

the initial false promise that undergirds the finding of fraud. Parenthetically, even as of the date of the sentencing hearing the only payment that had been made on the obligation (a $5,000 partial payment) had come from Bailey's brother William (he and his wife had been good friends of the victim before Bailey entered the picture, and they still are).

Bailey stoutly denies any such involvement, which if proved by the United States would drive the applicable Guideline through the roof: In this instance Guideline § 2X1.1(a) (dealing with attempts, solicitation or conspiracy) looks to the base offense level for the substantive offense of murder, which under Guideline § 2A1.1 is a level 43. And level 43, even without reference to the possibility that any of the factors discussed earlier in this opinion would lead to an even higher offense level, is at the top of the sentencing table, calling for a sentence of life imprisonment without possibility of parole.

Understandably much of the focus of the evidentiary hearing has been on the government's efforts to prove that charge by a preponderance of the evidence (see *United States v. Ewers*, 54 F.3d 419, 421 (7th Cir. 1995) and cases cited there) and on Bailey's efforts to demonstrate that the government has not met even that standard, although it is substantially less demanding than the normal criminal standard of proof beyond a reasonable doubt. And the difficulty of resolving the question has obviously been compounded by the facts that:

1. More than 18 years have gone by since Brach's mysterious disappearance, without any murder charge having been leveled against anyone by the authorities who have been and are most directly involved in the investigation and possible prosecution (indeed, without any hint as to the location of Brach's body—assuming that there has been a murder, as seems almost a certainty).

2. With no direct evidence being available as to the means by which Brach's apparent murder was carried out, the circumstantial evidence proffered by the two sides points in different directions.

3. Much of the circumstantial evidence (again from both sides) stems from sources that clearly raise the need to engage in judgments as to the believability of witnesses whose credibility is suspect for one reason or another.

Before this opinion turns to the crucial task of resolving the ultimate issue, it should be said that Bailey did himself no good by demonstrating his utter lack of credibility in relation to matters dealing with Brach (just as he did in the other areas that have already been discussed in this opinion). Not to put too fine a point on matters, this Court finds for example that:

1. Bailey plainly lied by trying to place himself in Florida rather than in the Chicago area during the time frame that he knew the government was claiming that arrangements were made for the Brach murder: the period immediately preceding February 15, 1977. His bogus story about being in Florida before he checked into the Colony Hotel in Palm Beach on February 16, a story that was already suspect (a) because he had never said that in the early days of the investigation and (b) because he had turned over no receipts of any such stay at the time that he gave the Colony receipt to the Glenview Police in March 1977, was flatly belied by the telephone records from his 505 North Lake Shore Drive, Chicago apartment during the critical period. There is no question that Bailey *was* in Chicago throughout that period earlier in February (before February 16).

2. Bailey also lied to, or equally suspiciously withheld facts from, the Glenview police during the investigative period shortly following the Brach disappearance (when the facts were obviously fresh in his mind). Thus he falsely told the police on March 16, 1977 that he had had *no* business dealings with Brach, although he misleadingly said only that his brother Paul Bailey had purchased two horses for her (even that number was false—as reflected earlier, Bailey and his brother had sold Brach three horses, though at the time of Bailey's statement only two remained in Brach's ownership, the third having earlier been claimed in a $5,000 claiming race). Indeed, Bailey elaborated in his March 16 statement to the police that "the only business he has done with Mrs. Brach" was that he then had two horses in his stables that belonged to her—another outright lie. Moreover, even though he then made it a point to tell the police about possibly suspicious circumstances involving some other parties, and even though in a March 25 further interview he answered a number of

police questions about Brach chauffeur Jack Matlick ("Matlick"), back in 1977 Bailey said not a word about the conversations that he *now* claims to have had with Matlick—conversations that, if they had really occurred as he now says and if Bailey was then trying to be candid and helpful as he purported to be, would certainly have been material because of their suspicious nature. This Court rejects Bailey's current testimonial version of those alleged conversations as totally false.

3. Bailey resolutely refused to acknowledge his having defrauded Brach (as he had defrauded so many other women) at the time that he and his brother Paul sold her the three horses that Bailey admitted having provided to her. Despite the enormous disparity between the cost of those horses to the two Baileys (a total that was under $20,000) and the $98,000 purchase price that was paid by Brach, throughout his cross-examination Bailey steadfastly refused to acknowledge his fiduciary obligation to Brach or to admit the obvious misrepresentations involved, insisting instead that Brach was a savvy purchaser and that she would have recognized the propriety of his collecting a "commission" (!!)—his euphemistic label for the 400% profit—that he conveniently concealed from her. And of course even that level of deception understates the facts, for what Bailey also hid from Brach was that *he* (and not just his brother) was engaged in the scam—that in fact Bailey was actually the most active participant.[12]

Although the list of Bailey's unquestionable lies could be extended, this Court recognizes that they do not of themselves necessarily call for assigning the far more serious murder-related offense to Bailey. It is perhaps arguable that they might instead be the product of Bailey's seeking desperately, back in the days of the 1977 investigation, to conceal facts that might make him the target of greater suspicion (that is, in an effort to distance himself from the murder investigation simply to avoid exposure of his other unsavory activities), and of an equally desperate (and particularly stupid) effort now to escape unfavorable inferences that could prove damning. All the same, when the process is the present one of placing evidence in the scales to see which side tips downward—the preponderance-of-the-evidence test—Bailey's total lack of credibility in key relevant areas begins that weighing process on the wrong side of the balance scales for Bailey.

Now to the task at hand. Two witnesses, Joe Plemmons and Cathy Jayne Olsen, respectively testified to a direct solicitation of Brach's murder by Bailey himself and to having overheard more than one conversation in which Bailey, Frank Jayne and others spoke in the same vein. Both of those witnesses (like Bailey himself, who of course denied any such conversations) pose serious credibility questions.[13] Accordingly this Court looks first to the kind of evidence that must always weigh most heavily in resolving such conflicts: evidence from more reliable

---

12. Bailey's lame attempt to adduce expert testimony about the "value" of the three horses, even apart from its demonstrated lack of reliability as compared with the testimony of the government's counter-witness, would not have provided any effective response to the aspects of Bailey's fraud referred to in the text. But the claimed expert testimony really proved to be of little or no real value in any event. No amount of "expert" prestidigitation (to pick only the most egregious instance) can convert the fair market value of Brach's Sweet Talk from the $3,200 that the horse had brought at auction 60 days earlier to the $22,500 price that Bailey and his brother extracted from Brach (without disclosing the earlier price, of course) on March 31, 1975. It developed on cross-examination that, unlike most experts, Bailey's testifying appraiser was not being paid any fee for her services. In this

instance Bailey received fair value for his non-payment.

13. Kenneth Hansen, whom Plemmons identified as the third person involved in the conversation in which Bailey assertedly offered $5,000 to Hansen (and then to Plemmons) to do away with Brach, furnished an affidavit in which he denied the conversation as well. But the facts that were then introduced by the government as to Hansen, who is now under indictment for the notorious triple murder of three youngsters some 40 years ago (those murders assertedly having stemmed from Hansen's reported regular pattern of picking up young boys and abusing them sexually) would make it difficult to credit anything that Hansen might proffer by way of testimony—certainly anything that would serve to exculpate him from what was assertedly involved here.

sources (particularly if long-after-the-fact recollective testimony from such sources is buttressed by objective documentary evidence) that tends to corroborate or to refute the more dubious sources.

In this instance there is no question, as has already been said, that Bailey cheated Brach. But Bailey seeks to blunt that as a motive for murder in large part by contending (1) that he was involved in the sale of only three horses to Brach, (2) that any concern on her part about having been defrauded in those transactions had to have arisen before January 1, 1977, and (3) that she had not only declined before that date to consider suing Paul Bailey (who it will be remembered was purportedly the only seller of those horses) but had spent New Year's Eve at the Waldorf–Astoria in New York in Bailey's company (and in his arms, at least while they were dancing to the music of Guy Lombardo and his Royal Canadians), having paid for Bailey's entire stay there. If those were indeed the only relevant facts, the words ascribed to Bailey by the two witnesses would seem highly improbable. If as Bailey testified he was looking to make further inroads into the Brach fortune (her "long bankroll," as he termed it), and if that possibility were not in jeopardy because Brach had become disillusioned about Bailey, that would surely render it less likely that he would—as he once said to another witness on the subject—"kill the goose that laid the golden eggs."

But Bailey's version plainly cannot be trusted, just as it is plain that he lied to the Glenview Police only a month after the Brach disappearance in telling them that the last time he had seen her was on that New Year's Eve. In that regard perhaps the most important witness (though, as will be seen, far from the only one) is someone who has no animus toward Bailey and no motive at all to fabricate—and, significantly, whose testimony is backed up by a document that confirms that the witness' current story is the same one that he had given more than 15 years ago.

Arthur Katz, who with his father had done extensive work for Brach over a period of more than a decade in designing and fabricating elaborate memorials for her and her entire family (and even her dogs!) at the family plot in Ohio, testified that his now-deceased father had become a close personal friend of Brach: Over the years they vacationed together in Florida (with no romantic involvement), he visited her in Ohio as well as in her Glenview home, she sought his advice on personal matters and more. Katz swore that shortly before her disappearance Brach had come in to see his father (where Katz and his father shared a very small business office) and said that she was highly disturbed by having been cheated in the purchase of horses, a purchase that had been induced by a much younger man whom she had been dating and who had made arrangements for her upcoming examination at Mayo Clinic (unquestionably an accurate description of Bailey). When Brach asked the advice of Katz' father about what she could do about it, he responded that he knew several lawyers in the State's Attorney's office and would arrange to take her there on her return from the Mayo Clinic—and she agreed to do just that. That was the last the Katzes ever heard from Brach, for she vanished just after her return from the Clinic.

Katz' testimony was squarely buttressed by the letter that he had sent back in 1979 to the lawyer-guardian who had been appointed after Brach's disappearance—a letter written in response to the guardian's reward offer for information leading to the discovery of Brach's whereabouts (dead or alive) or to the discovery of her body (Government Ex. Katz 3). Here is what Katz wrote at that time:

For the past 10 years prior to her disappearance, as you are aware of, we had been erecting the Brach–Vorhees memorial. During this time, Mrs. Brach and my late father had been very close friends and had many long discussions regarding their personal lives and problems. These discussions were held here, Steubenville, Ohio and at her home in Glenview, and also at her condominium in Florida.

Before my father passed away in February 1978, we had many discussions as to the whereabouts of Mrs. Brach. I am, therefore, offering my information that may lead to the solution of Helen Brach's disap-

pearance and reward that has been offered by the estate.

Before Mrs. Brach disappeared, she had mentioned to my late father that she had been dating a much younger man who had induced her into purchasing several race horses from him, only to find that she had been taken. She was going to try to get back what she had lost. Mrs. Brach was a very intelligent and shrewd woman and did not like to be taken.

The same person she bought the horses from, she confided to my father, had made arrangements to get her into the Mayo Clinic in Rochester, Minnesota.

I would strongly suggest that this individual should be given a lie detector test and further investigation should be made with reference to the above.

Though Bailey's lawyer sought to shake Katz' story on cross-examination, nothing really cast any doubt on its accuracy—and it has strong internal indicia of reliability as well. This Court credits it entirely.

Moreover, there is other strongly corroborative evidence to confirm that things had changed dramatically during the seven weeks that elapsed between New Year's Eve and the time that Brach vanished from the face of the earth. In terms of the horses that had originally been foisted on Brach by Bailey and his brother, it was *after* the beginning of the 1977 year that Brach obtained an appraisal that told her that she should invest *nothing* in training Potenciado, the horse on which Jerry Farmer—Bailey's coconspirator whom he had recommended to Brach—wanted her to spend $50,000 for that purpose (the testimony of John Keefe). And in addition to the initial fraud that had been involved in the

Baileys' sale of the three horses to Brach in 1975, there is credible evidence that Bailey and his fellow conspirators (including Frank Jayne) had made their sought-after major score by way of persuading her to make a large investment in brood mares. Thus John Schaumberg told one of the investigating agents of a call that he received from Frank Jayne shortly after the Brach disappearance, asking whether Schaumberg would take off of Jayne's hands "a bunch of brood mares" belonging to Brach.[14] Importantly, that is borne out by statements from Bailey himself:

1. Bailey told his then-protege in fraud, Lance Williamson, that he had not only defrauded Brach (whom he had earlier introduced to Williamson) in connection with the original racehorses that were sold to her through Bailey's brother P.J. but that he also intended to make a "big score" by selling her brood mares.

2. In 1979 or 1980 Bailey told John Staren, who was at Bailey Stables two or three times a week and was socially friendly with Bailey, that he had sold Brach brood mares, having made a "couple hundred thousand dollars" in transactions with her. On another occasion Bailey told Staren that Brach had been one of his best—or biggest—pigeons.[15]

It is true that no documentation now exists that evidences such further transactions, but as already stated the existing documentation does not cover even the purchase of all of the first three horses that admittedly took place. Nor do the post-disappearance records of boarding expenses and tax returns put together by accountant Everett Moore negate the statements made by the witnesses and by Bailey and his coconspirators.[16] For one

14. Victor Escalle, in the 1970s one of the disreputable hangers-on participating in the crooked dealings at the Jayne stables, also testified that Frank Jayne had briefly told him, shortly after Escalle had seen Brach with Bailey at the stables, that Jayne and Bailey had a deal under which the "Candy Lady" was buying brood mares.

15. Those statements would be unexplainable if the only horse deals that Bailey had foisted on Brach were the sale of the three racehorses in 1975 for an $80,000 profit split between Bailey and his brother. That amount, though scarcely insubstantial, is much smaller than some of the

other fraudulent transactions in evidence—and it certainly does not meet the "couple hundred thousand dollars" level to which Bailey referred in talking with Staren.

16. Testimony by Barbara Mulvihill, though not confirming that the conspirators *succeeded* in their additional fraudulent efforts, did corroborate their attempts to do so in the early part of 1977. Mulvihill was highly credible, again with no incentive to fabricate, and her testimony as to the date of the proposed showing of horses to Brach is corroborated by part of the stipulated testimony of Judy Orbitson Mielenz—not the part that Bailey relies on to deal with an issue of

thing, the Karstenson fraud illustrates that in the breeding scam inflicted on her (which bore a resemblance to the "big score" involving Brach) the victim was not called upon to bear boarding expenses. And as for the purchase price of the horses, it will be remembered that Moore was never given the information about Brach's earlier purchases until after, the fact—and in this instance Brach disappeared before that could be done. Thus the current absence of records, long after the fact, is overridden by the numerous independent confirmations of this further and more egregious fraud perpetrated on Brach.

There are still other ways in which the evidence of Brach's knowledge of and indignation at the fraud, and of her intention to pursue the matter with the authorities, goes beyond the persuasive Katz testimony and his 1979 letter. Mary Herbold, who had leased a saddle shop in Northwestern Stables from Frank Jayne but had no involvement in the sale of horses there, testified that she had met Brach riding on the nearby trails and became friendly with her, seeing her once or twice more on the trails, perhaps a dozen times at Bailey Stables and at least once at Brach's home in Glenview. Close to the time that Brach had said that she was going to the Mayo Clinic (within two weeks or so before that trip), and after Brach had earlier told Herbold that she was going to a stable in Elgin to look at breeding stock that she had *just bought,* Herbold heard Brach at Bailey Stables raising her voice, stating that she was very upset at having been cheated and that she was going to the district attorney's office. And here is a related stipulation between the parties:

> If Detective Tomanek of the Glenview Police Department was called to testify, he would testify that following an interview of Mary Herbold in 1988 he included the following in his report of interview.

> "Mary Herbold related that she remembers an incident in which Helen V. Brach had told her that she was going to go to 'R Day Stables in Elgin to look at her new 'breeding stock' she had just bought. Mary interpreted this to mean that Helen V. Brach had just bought a 'group' of expensive thoroughbreds. Mary Herbold related that upon Helen V. Brach's return she was extremely upset and was screaming at everyone in the stables about her being cheated into buying garbage horses, and further reference was made by Helen V. Brach about going to the district attorney about this. *It is unclear if Mary Herbold witnessed this display herself or heard it from her daughter, who may have witnessed this at Bailey's Harms Woods Stables.*"

He would also state that he cannot recall how questions to Herbold were phrased. He cannot state whether the italicized line was a note to himself that a follow-up interview should be conducted because of ambiguities in his questions, or whether it reflects an impression that he formed from the witness.

Having heard Herbold's testimony, this Court has none of the doubts suggested by the last paragraph of that stipulation. Herbold was *very* precise not only in her recollection of the event but also as to just where she was and where Brach was in relation to the stables at the time of the occurrence. And Herbold testified that there were plenty of people around the stables when the event took place. In summary, the totality of the relevant evidence confirms that Brach was ready and willing (and in fact eager) to "blow the whistle" on Bailey upon her return from Mayo Clinic.[17]

timing or credibility that turns out to be a red herring, but the other part that places in January 1977 (on Mielenz' return to Chicago from a Florida vacation) the breaking of a leg by Samone, a horse that had been intended to be one of those shown to Brach.

17. Bailey testified, and expects this Court to believe, that he had sexual relationships with a number of his other marks but a purely platonic relationship with Brach—though that latter

claim has been contradicted by his own statements to others. Although this point is not necessary to the decision, if (as appears more probable) he *was* involved with Brach sexually just as he was with a number of his other victims during his sordid career, it would understandably heighten the level of Brach's fury when she had ultimately learned of the swindles that had been perpetrated on her by Bailey.

Nor can Bailey claim (as his counsel urged in closing argument) that he was ignorant of Brach's displeasure—even apart from Brach's open display of rage at Bailey Stables (which would surely have been communicated to Bailey), another witness (William Corwin, who was then the manager of Bailey Stables) said that shortly after the beginning of 1977 Bailey had told him that Brach might be moving her horses and that she was hiring an appraiser (as she then did) because she felt that she had been conned. And still another of the people engaged in the unsavory aspects of the horse industry, Jerry Holly (who had been associated with Frank Jayne in the 1970s) stated to a state investigator as far back as 1980 that he had been in a conversation with Jayne and Bailey in which they had told him of a $600,000 investment that Brach had made, and that she wanted her money back or she was going to the authorities. Holly and Jayne have since had a falling out that actually resulted in a shootout between them, but Holly had no reason to implicate *Bailey* falsely. Another nail, then, has been driven into Bailey's figurative coffin.

This discussion could be prolonged by adding other pieces to fill in the evidentiary puzzle. But the bottom line is that although it might be contended that the evidence would not suffice to withstand beyond-a-reasonable-doubt scrutiny, the evidence unquestionably demonstrates a powerful motive for Bailey to dispatch Brach before she could carry out her announced intention to go to the prosecuting authorities. And not incidentally, that motive fits hand-in-glove with the kinds of lies that Bailey gave to the police investigators about a month after Brach's disappearance. Indeed Bailey's "you don't kill the goose that lays the golden eggs" argument really backfires: Here the golden eggs were really the major ill-gotten profits that were regularly being obtained by Bailey and his fellow conspirators from their multifaceted frauds, and for that purpose the goose that was laying those eggs was the multifaceted scheme itself. It was Brach—a woman of prominence and means—who was the potential killer of *that* goose. There was a strong incentive on Bailey's part to prevent her from doing that, and a number of Bailey's associates—Frank Jayne, Kenneth Hansen and others—were known for violence.[18]

All that has been said to this point lends credence to what would otherwise be highly suspect testimony from Plemmons and Olsen. Unfortunately this Court, which is forced to examine the matter so long after the fact, and in so doing must peel away the layers of credibility as well as time, cannot have the assurance that is possessed by the actual observer of events (or by the all-seeing eye of the third-party narrator in a novel). But what might otherwise be a questionable account, offered by a person who had the incentive that Plemmons possessed to benefit himself (and his girlfriend) by assisting the government, has gained a great deal of probative force from the inferences that are properly drawn from the other clearly credible evidence. Indeed, even on its own the Plemmons version cannot be explained away as a manufactured account—it contains ingredients that Plemmons would have no logical way of knowing unless the event had actually transpired much as he recounted it. As for Olsen, she has certainly given a substantial number of shifting accounts over the years (and even during her brief time on the stand here), and she must be considered as a dubious witness in the particulars of her account. But no more need be said in that last regard: Even if no value at all is ascribed to her testimony, the totality of the other evidence is more than sufficient for present purposes.

But what of chauffeur Matlick, on whom most of the investigative attention has reportedly focused?[19] Although this Court has not been made privy to the reasons that have prevented the authorities from proceeding with charges against Matlick, the bits of evidence that have been provided to this Court

---

18. It is the government's position that the same tendency to violence may be ascribed to Bailey himself, but this Court need not accept that argument to reach its decision here.

19. Relatedly it appears that the authorities' concentration on Matlick as the possible prime suspect was the reason that Katz' 1979 letter did not get the follow-up attention that hindsight tells us should have been given to it.

by stipulation certainly portray Matlick in a highly suspicious light. Those matters could well be viewed as consistent with an awareness on Matlick's part that Brach would not return. But is Matlick a more likely suspect than Bailey? That is really impossible to tell when *all* of the evidence as to Bailey has been placed before this Court for evaluation, while as to Matlick (1) nothing has been provided in terms of background, (2) only limited information has been furnished from which to infer a motive for murder, and (3) most significantly, nothing has been tendered covering other factors that might enter into the equation.

There is of course another hypothesis that could eliminate the either-or question posed in the preceding paragraph—the possibility that both Bailey and Matlick were involved in Brach's disappearance. In that respect this Court does not credit the facet of Olsen's testimony in which, for the first time in all of her accounts over a period of several years, she has now identified Matlick as present during one of the conversations to which she referred. But we have only Bailey's word for the fact that he did not like Matlick—a statement that is self-serving, just as are Bailey's current accounts of his purported conversations with Matlick during the days that followed February 17 (conversations that Bailey *never* described, and that with one exception he never even mentioned, to the Glenview Police in his interviews in March 1977). But this Court will not indulge in speculation, let alone reach any conclusion—even tentatively—on such thin information. All that can be said is that tossing the limited Matlick evidence into the scales does not shift the evidentiary balance.

When all is said and done, Bailey surely had a strong motive for taking the action that Plemmons ascribes to him. And the record does offer more than enough to over-balance the possibilities that Bailey and his counsel have advanced. Bailey's purported alibi turns out to be no alibi at all, but a falsified account of his whereabouts—and that falsification supports the inference that

the rest of his conduct in Florida during his week there in February 1977 was also no more than an effort to contrive a cover story.[20]

In summary in terms of the appropriate preponderance-of-the-evidence test, on the record before this Court it is more probable than not that Bailey did commit the offenses of conspiring to murder and soliciting the murder of Helen Brach, as charged in Racketeering Act 4 in Count Two of the indictment. And with no reduction from the Guideline level of 43 being attributable to that offense (to say nothing of the aggravating factors discussed in the earlier section of this opinion that would elevate that level), that calls for a sentence of life imprisonment for Bailey.

### SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

This Court's June 6, 1995 memorandum opinion and order (the "Opinion," occupying more than 40 typewritten pages) reviewed in detail the bases for this Court's Sentencing Guideline ("Guideline") determination as to Richard Bailey ("Bailey") following a nearly two-week evidentiary hearing. In the course of the June 6 allocution hearing that was expected to lead into the immediate imposition of sentence, two issues were raised that had not been dealt with in the Opinion:

1. During this Court's oral review of the substance of the written Opinion, Probation Officer Elisa Ehrlich inquired as to the possible imposition of still another increase in the Guideline offense level on the ground of Bailey's willful obstruction of justice during the evidentiary hearing (Guideline § 3C1.1).

2. After this Court had announced its conclusions and was about to impose sentence, Bailey's counsel belatedly raised an issue that neither he nor his counsel had ever addressed before, despite their having had every opportunity to do so: the question whether the imposition of a term of life imprisonment because of Bailey's complicity in seeking the murder of Helen

---

**20.** For example, with Brach ready to go to the authorities because of having been defrauded by Bailey (and others), is it plausible that she would be prepared to buy *more* horses at Bailey's behest? Yet Bailey expects us to credit his testimony to that effect.

Brach ("Brach") would violate the Ex Post Facto Clause.

This supplement to the Opinion will address both of those issues, as well as some other new issues that Bailey's subsequent filing ("Bailey Final Mem.") has injected into the case.

■ As this Court was in the process of preparing the Opinion, it had given serious consideration to the possibility of ordering a further 2–level increase in Bailey's offense level on the ground suggested by the Probation Officer. There is certainly ample authority for doing so, both in the language of Guideline § 3C1.1 (including the Application Notes to that Guideline) and in the extensive case law applying that provision—indeed, Application Note 4 to Guideline § 3E1.1 reflects the fact that conduct of the type that triggers the operation of Guideline § 3C1.1 ordinarily also causes (as such conduct has done here) the denial of the acceptance-of-responsibility reduction in offense levels— thus effectively creating a 4–level or 5–level swing as the result of the obstructive conduct (such as testifying falsely during a sentencing hearing, as Bailey did here).

What has informed this Court's omission of such a further adjustment from the calculation (despite its potential applicability to Bailey) is rather a combination of (1) this Court's recognition of the pyramiding effect on Bailey's sentence of some closely-related factors discussed in the Opinion, which as explained there have had a multiple operation in the Guideline sentencing scheme applicable to Bailey, and (2) the fact that the inclusion or exclusion of the additional 2– level increase would, under the special circumstances of this case, make no difference in Bailey's actual sentence in any event. This Court has often said in the course of sentencing criminal defendants that its consistent practice in selecting a specific sentence after the Guideline range has once been determined is to begin presumptively in the middle of that range, which would apply to a person who might be thought of as the

"typical" defendant having the same offense level and criminal history, and then to consider moving upward or downward within that range depending on how the individual characteristics and circumstances of the actual defendant who is then facing sentencing compare with those of the hypothetical typical defendant. If Bailey were in fact required to be sentenced in this case under a Guideline calculation and within a range other than the one that is dictated by his involvement in the Brach murder, this Court would employ exactly that line of analysis.

As Opinion at 1008 reflects, without the addition of a further increase in level for obstruction of justice Bailey's non-Brach-related offense level would be 30 and his criminal history category would be II, producing a Guideline range of 108 to 135 months. In that situation, the fact that Bailey has really aggravated the seriousness of his offenses by the deceptive testimony that he gave in so many respects during the sentencing hearing would in this Court's view move him to the very top of that range: 135 months.

But suppose on the other hand that a 2– level increase in the offense level to a level of 32 were to be imposed because of Guideline § 3C1.1. In that event the non-Brach-related Guideline range would become 135 to 168 months.[1] And in that event the higher range would not only have taken full account of every adverse factor about Bailey that the Guidelines identify as relevant to his sentencing (except, of course, his involvement in seeking the Brach murder) but—as suggested in the Opinion—would also have had some disquieting overtones of having brought quite similar factors to bear on more than one of the adjustments that the Opinion found to have been required by the Guidelines. Although that perception would not call for this Court to reconsider any of the several adjustments that were so painstakingly reviewed and analyzed in the Opinion, it would have led this Court to sentence Bailey at the low end of the higher range—once again a custodial term of 135 months.

---

1. That relationship between levels is typical of the Guideline grid, under which (once an offense goes above the lowest levels in that grid) a 2– level differential in the same criminal history category produces a range whose starting point (its lowest figure) coincides exactly with the end point (the highest figure) of the original range.

In short, the issue that was properly raised by the Probation Officer would have had no impact at all on the sentence that would actually have been imposed on Bailey if his involvement in the Brach-related offense had not operated to trump the other Guideline calculation. Because the question is thus really moot for that reason as well as for the more obvious reason that the calculation is itself inapplicable,[2] this supplement will turn to the new matters that have been raised by Bailey's attorneys.

Any such late assertions are particularly troublesome under the circumstances of this case. As has been indicated in the Opinion, defense counsel initially submitted a May 17, 1995 letter (as this Court had requested) that dealt with certain sentencing issues posed by the Probation Officer's calculation as set out in the PSI. Next on May 19 the government filed its detailed and all-inclusive Sentencing Memorandum (just over 20 pages), which made no secret whatever of the government's position on the core Brach-related issue— here are the very first two sentences of that government memorandum:

> The United States of America, by its attorney, JAMES B. BURNS, United States Attorney for the Northern District of Illinois, hereby submits this memorandum in support of the positions it intends to take with regard to Bailey's sentence. If Bailey is found to be involved in Helen Brach's murder, his base offense level should be 43, pursuant to Sentencing Guideline Sections 2E1.1 and 2A1.1.

Then on June 1 (in the midst of the evidentiary portion of the sentencing hearing) Bailey's counsel filed their own Reply to the Government's Sentencing Memorandum. Although they there characterized that response as "repl[ying] to other parts of the sentencing memorandum not heretofore ad-dressed," and although Bailey's counsel there dealt in detail with a whole series of issues that the government's memorandum had urged upon this Court, *not one word* was said to suggest that the level 43 figure was open to challenge on any ground.

If this proceeding did not involve the liberty of an individual, but just his or her pocketbook instead, this Court would not be hesitant in considering the possibility of ruling that an issue thus raised only *after* this Court had already announced its decision had been waived.[3] It has been plain at least since *Link v. Wabash R.R.,* 370 U.S. 626, 633–34, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962) that the sins of a lawyer may properly be visited on the client who voluntarily chose that lawyer as his or her representative—and that same principle has been frequently repeated and applied since then by many courts, including our own Court of Appeals and this Court. But as this Court stated orally when the ex post facto question was first raised by Bailey's lawyer and when the prosecutor immediately responded by urging that it was too late to do so, this Court is not prepared to entertain the sentencing of any defendant where a merits-related issue that could affect the sentence to be imposed has not been given full consideration.

■ But having said that, this Court's examination of the Ex Post Facto Clause and the relevant Seventh Circuit jurisprudence that applies it has disclosed that the Bailey argument is lacking in legal merit. Put in its simplest terms, the Bailey contention is that the Brach murder took place in 1977—over a decade before the Guidelines even took effect. That being the case, Bailey's counsel contend that any application of the *current* Guideline to determine the effect of that long-ago conduct[4] is the equivalent of impos-

---

**2.** It will be recalled that the entire discussion of the non-Brach-related alternative had been included in the Opinion before the Brach issues were addressed, and it was then really retained for informational purposes if this Court's determination on the Brach matter did not ultimately prevail on the inevitable appeal.

**3.** There was nothing said during the course of this Court's sentencing statement that would have sparked defense counsel's perception of a previously-unthought-of ex post facto problem. If that issue was potentially in the case, counsel had to have known about it earlier.

**4.** Both 18 U.S.C. § 3553(a)(4) and implementing Guideline § 1B1.11 call for the use of the Guideline in effect at the date of sentencing. But Guideline § 1B1.11(b)(1) recognizes that the operation of the Ex Post Facto Clause, where applicable, must constitute an exception to that rule.

ing a greater punishment after a criminal act has already been committed—the essence of ex post facto unconstitutionality.

That however is both overly simplistic and, if applied to this case, analytically unsound. There is of course no question as to the basic ex post facto doctrine applicable to this area of the law, as has recently been recapitulated in *United States v. Shorter*, 54 F.3d 1248, 1261 (7th Cir.1995):

> Sentencing courts apply the guidelines in effect at the time of sentencing unless doing so would violate the Ex Post Facto Clause. *United States v. Hathcoat*, 30 F.3d 913, 919 (7th Cir.1994).
>
> \*     \*     \*     \*     \*     \*
>
> "[W]hen the Sentencing Commission amends the Guidelines to increase the severity of a punishment, the Ex Post Facto Clause prohibits application of the amended Guidelines to crimes performed before the amendment's effective date" if the new range would have required an upward departure under the pre-amendment Guideline. *United States v. Kopshever*, 6 F.3d 1218, 1222–23 (7th Cir.1993); *see also United States v. Seacott*, 15 F.3d 1380, 1384 (7th Cir.1994) ("[R]etroactive application of a harsher sentencing guideline contravenes the very purpose of the Ex Post Facto Clause."); *id.* at 1386 ("[A] guideline amendment which occurs after the commission of the defendant's crime which works to the defendant's detriment is inapplicable because it is a violation of the Ex Post Facto Clause.").
>
> Determining whether an amended guideline can violate the Ex Post Facto Clause turns on whether the criminal conduct extended past the effective date of the amendment. *Kopshever*, 6 F.3d at 1221.[5]

But the specialized application of that doctrine to an extended criminal conspiracy such as the RICO conspiracy to which Bailey has pleaded guilty looks not to the Guideline

(which is effectively the operative law) that existed at the time when a particular overt act in furtherance of the conspiracy may have taken place, but rather looks to the time when the *most recent* criminal implementation of the conspiracy occurred.

To begin the tortuous course that must be traced through the Guidelines here, it will be recalled that RICO (Guideline § 2E1.1(b)) carries a base offense level (if greater than 19) of "the offense level applicable to the underlying racketeering activity." In this instance the particular "underlying racketeering activity" is the solicitation of the Brach murder (see 18 U.S.C. § 1961(1)(A)), and the provision that governs such solicitations to commit crimes looks to "the base offense level from the Guideline for the substantive offense" (Guideline § 2X1.1). More specifically, ever since November 1, 1990 the Guidelines have included a specific provision dealing with conspiracy or solicitation to commit murder (Guideline § 2A1.5). Under that provision, if (as here) the *death* of a victim has actually resulted, Guideline § 2A1.5(c)(1) requires the application of the first degree murder Guideline (which is Guideline § 2A1.1)—and that is where level 43 enters the picture.

So what we have is an act—a conspiracy involving the active solicitation of a murder, closely followed by the victim's death—that was committed long before the Guidelines were even thought of, let alone before they were prescribed by Congress and later promulgated. But for both Guideline and ex post facto purposes, what controls instead of the time of commission of that earlier criminal act is that when Bailey then continued his RICO activity for an extended period of years—well past November 1, 1990—(1) the *then-existing* law (that is, the Guidelines as they had been amended November 1, 1990) specifically took into account Bailey's earlier criminal conduct, and (2) under the criminal

---

5. [Footnote by this Court] As chance would have it (and as Opinion 14–15 mentioned), it was this Court—then sitting with our Court of Appeals by designation—that in *Kopshever* explained the Ex Post Facto Clause ramifications in a conspiracy case such as this. And in doing so, this Court anticipated what our Court of Appeals (then alone among all of the Circuits) had not yet held.

It was not until the following year in *Seacott* that our Court of Appeals actually announced the position that was later quoted in *Shorter*. As is discussed later, Bailey Final Mem. 10–11 seeks to call to Bailey's aid what this Court said for the panel in *Kopshever*. But even apart from the disturbing manner in which that attempt has been framed, it is substantively inapropos.

law, Bailey is treated as though he *knew* that was the then-existing law when he continued to break the law. In other words, the premise of the criminal law is that when after November 1, 1990 Bailey made the choice to persist in his antisocial conduct, he took the risk that if he were caught and successfully prosecuted for (or what amounts to the same thing, if he pleaded guilty to) his post–November–1990–Guideline criminal conduct, he would suffer whatever consequences the law *then* attached to such conduct (including the imposition of punishment based in part on his *earlier* criminal conduct).

In that respect our Court of Appeals has dealt with and has flatly rejected a contention legally parallel to Bailey's. In *United States v. Korando,* 29 F.3d 1114 (7th Cir. 1994) a defendant who was found guilty of participation in a RICO conspiracy that extended into 1992, but in pursuance of which conspiracy had committed a 1987 arson and a 1989 arson as the predicate acts for his conviction, argued that he should not be tagged with the provision of the Guideline Manual that came into effect *after* those arsons had been committed and that had upped the ante imposed by the Guideline for such arson offenses. Here is what our Court of Appeals said in dispatching that contention (*id.* at 1119–20):

> This [more stringent Guideline] provision went into effect November 1, 1990. Korando argues that because this provision is harsher than the one in effect in 1987 and 1989, the dates when he committed the two arsons that are the predicate acts for his RICO conspiracy conviction, application of the Guideline that later became effective violates the ex post facto clause.

The Guidelines themselves indicate that the court should apply the Guideline Manual in effect on the date the defendant is sentenced, unless the ex post facto clause requires the court to use the Guideline Manual in effect on the date that the offense of conviction was committed. U.S.S.G. § 1B1.11. It is true that we have recently held that the application of a more severe Guideline than the one in effect when the defendant committed his crime represents a violation of the ex post facto clause. *United States v. Seacott,* 15 F.3d 1380, 1384–86 (7th Cir.1994). But the Guidelines commentary further provides that if the dates for a series of offenses straddle a change in the Guidelines, the date of the last offense should control. Our cases have therefore consistently held that where a harsher Guideline becomes effective during the course of a conspiracy, a defendant who does not withdraw from the conspiracy before the effective date of the more severe Guideline should be sentenced pursuant to the more recent Guideline. *E.g., United States v. Jackson,* 983 F.2d 757, 771 (7th Cir.1993).

Accord, *Shorter,* 54 F.3d at 1262.[6]

█ That concept—that the criminal law in effect at the time of commission of a current crime may take cognizance of the defendant's prior criminal conduct in fixing the punishment for that current crime, even though such a consequence may not have been thought of (or may not even have been foreseeable) when the earlier crime was committed—is one of the fundamental notions in criminal jurisprudence. And that basic principle is well illustrated by a few familiar instances of existing legislation.

---

**6.** As already indicated in this opinion, Bailey Final Mem. has not been strictly limited to the ex post facto issue but has also raised some other questions for the first time. As for the ex post facto issue itself, however, Bailey Final Mem. 8–9 makes its best argument by pointing to the Third Circuit decision in *United States v. Bertoli,* 40 F.3d 1384, 1402–05 (3d Cir.1994) and some earlier Third Circuit cases applied there. *Bertoli* dealt with a substantive change in the Guideline, calling for a more severe penalty, that had taken effect *after* the commission of the crime charged in the particular count on which the district court had imposed sentence. In that situation the Third Circuit disapproved the practice of combining different counts in determining the applicable Guidelines Manual—thus rejecting the so-called "one-book rule" of Guideline § 1B1.11(b)(2) on ex post facto grounds. But our own Court of Appeals (like a number of other circuits) has upheld the one-book rule (*United States v. Boula,* 997 F.2d 263, 266 (7th Cir. 1993)), and what this Court has ruled in this case conforms directly to the Seventh Circuit decision in *Korando,* which this Court is obligated to follow. If the type of approach and ruling that is reflected in *Bertoli* is instead to govern a case such as the present one, that is for our Court of Appeals—and not for a District Court sitting within the Seventh Circuit—to decide.

Take for example the Armed Career Criminal Act, 18 U.S.C. § 924(e), which raises the penalty for current possession of a firearm by a previously-convicted felon from an otherwise-applicable maximum of 10 years in prison (18 U.S.C. §§ 922(g) and 924(a)(2)) to a mandatory *minimum* sentence of 15 years (and a maximum of life in prison without parole) if the defendant "has three previous convictions ... for a violent felony or a serious drug offense." Leaving aside the sometimes troublesome question as to what constitutes "a violent felony" for that purpose, that statute applies inexorably even though at the time that the earlier offenses were committed there was no way for the defendant to know that the impact of a future crime could be so severe. Thus some years ago, when the existence of three prior offenses had jumped the stakes even more—from a 2–year maximum to a 15–year minimum—this Court was compelled to impose a 15–year sentence on a man in his 50s, two of whose prior "violent felony" offenses dated back fully 35 years (as a teenager he had participated in two gas station robberies in the course of a brief law-breaking spree). This Court then urged defense counsel to take the matter to the Court of Appeals to advance a Cruel and Unusual Punishment Clause argument, to see whether some escape hatch might perhaps be found despite the known hopelessness of the jurisprudence in that area (the case was *United States v. Hayes*, 919 F.2d 1262, 1265–66 (7th Cir.1990))—but not in that case, nor in any of the numerous other cases that have applied the same statute to count old offenses that were committed before the statute's enactment, was there even a hint of any remote possibility that the Ex Post Facto Clause was implicated in applying that recidivist statute to the defendant. And to bring the same analysis into today's terms, exactly the same notion is at the heart of the current "three strikes and you're out" (or more precisely "three strikes and you're in") legislation, under which a single current offense can (without encroaching on the Ex Post Facto Clause) visit previously-undreamed-of severity on a defendant whose past includes two convictions that did not carry a price tag even approaching what the new law has now prescribed.[7]

It may be that no criminal advocate has the time or the inclination to ponder the underlying principles of the criminal justice system. At their core those principles are (1) freedom of will (that is, the individual is free to choose between lawful and unlawful conduct, and upon choosing the latter he or she must suffer the legal consequences of that choice)[8] and (2) every individual's presumed knowledge of what conduct is unlawful and of the potential legal consequences of such conduct. At least the second of those factors may not be true in many instances, but to the extent that it may represent a

7. All of this makes it plain that it is entirely irrelevant to urge upon this Court, as Bailey Final Mem. 2–3 seeks to do, the lesser penalty that Illinois state law had attached to Bailey's solicitation to commit murder at the time that he engaged in that criminal conduct. Again the relevant question is not that historical treatment of the offense, but rather the later Guideline evaluation of that offense—and that is so because the offense was part of an ongoing RICO conspiracy that continued into the Guideline time period. What has been said in the text also torpedoes Bailey's argument that his post-Guideline RICO offenses did not involve any new murder solicitations. As the statutory examples discussed above illustrate, it is not at all necessary for Guideline purposes that the nature of a defendant's particular criminal acts in furtherance of a conspiracy during the current period must mirror those by which the defendant had implemented the same conspiracy earlier. In that respect it may be noted that Bailey's prior conduct, the murder solicitation established by the preponderance of the evidence in this proceeding rather than by a criminal conviction, has by definition gone unpunished in the past—and although that factor does not bear on the legal argument (the ex post facto question), it renders it less troubling that the Guideline that includes the consideration of that solicitation is more strict than the Guideline calculation that does not.

8. Thus, as *United States v. Jackson*, 983 F.2d 757, 771 (7th Cir.1993) (cited with approval in *Korando*, 29 F.3d at 1120) said in rejecting a defendant's ex post facto argument comparable to Bailey's in relation to a continuing conspiracy:

He could have avoided imposition of the Sentencing Guidelines by ceasing the criminal conspiracy prior to November 1987. But he continued, and the new sentencing provisions justly apply.

And as *Korando* reflects, the identical analysis extends to a change that toughens the relevant Guideline.

legal fiction it is still indulged because it is essential to the functioning of society. Bailey cannot complain—at least in legal terms—because the combination of those principles operates with a heavy hand in his case.

It takes only a moment's thought to recognize the implausibility of the argument of Bailey's counsel that is based on the time relationship between Bailey's solicitation of the Brach murder and the later promulgation of the Guidelines. Because Bailey's 1977 crime antedated the earliest of the Guidelines by more than ten years, his counsel must urge either (1) that the crime cannot be considered at all in calculating Bailey's potential sentence (for no Guideline was applicable to the crime when it was committed) or (2) that a Guideline as of some date other than the date of commission of the earlier crime does apply. Of course the former position is untenable, because from the very beginning the Guidelines have permitted courts to consider pre-Guidelines crimes in continuing conspiracy cases to determine the offense level that applies to post-Guideline crimes that implement the conspiracy. And as for the latter position, there is no logical predicate for selecting the November 1987 Guideline as Bailey Final Mem. 3 suggests. That date is not relevant *either* to the Brach murder solicitation *or* to the events that are within the RICO statute of limitations—in terms of selecting the appropriate Guideline, November 1987 would be totally arbitrary.

In short, what is involved here as to the ex post facto question is not (as Bailey's counsel would have it) the retroactive application of later Guidelines. What is instead involved (and is plainly proper under the teaching of *Korando* ) is the *current* application of the current Guidelines Manual, which expressly takes account of Bailey's earlier criminal activity in measuring his possible sentence. On

that score this Court has read all of the authorities cited in Bailey Final Mem.—and all of them are simply beside the mark, with the possible exception of the out-of-Circuit *Bertoli* decision that may perhaps be considered by our Court of Appeals if it decides to change the law, but that may *not* be chosen by this District Court in preference to existing Seventh Circuit law.

In fact, the United States' response to Bailey Final Mem. ("Govt. Final Mem.") has identified an alternative route that leads inevitably to the same destination—a route that was specifically approved by our Court of Appeals in a case in which Bailey's present counsel actually represented the losing defendant and had advanced the same type of ex post facto argument.[9] In an extraordinarily similar factual scenario, *United States v. Masters,* 978 F.2d 281 (7th Cir.1992) also involved a defendant charged in a RICO conspiracy that had extended past the November 1, 1987 effective date of the Guidelines—and one of the racketeering acts that the defendant there was found to have committed was also a conspiracy to commit murder several years *before* the Guidelines took effect. Though the defendant in *Masters* was also not convicted of the murder itself, the Court of Appeals expressly approved the use of the Guideline level of 43 that applied to murder even under the *pre*-November 1, 1990 Guidelines.

Here is how *Masters, id.* at 284 described that second alternative approach:

> 2. Section 2E1.1(a)(2) refers to "the offense level applicable to the underlying racketeering activity." Instead of turning to the guideline for conspiracy to commit murder, as in the prior method, one may turn to the guideline for murder, § 2A1.1. The base offense level for murder is 43. Life imprisonment is the sentence prescribed for level 43 offenses.

---

9. This District Court's Rules of Professional Conduct, applicable to all lawyers who practice before it, provide in relevant part (Rule 3.3(a)(3)):

> (a) In appearing in a professional capacity before a tribunal, a lawyer shall not:
>
> \* \* \* \* \* \*
>
> (3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the posi-

tion of the client and not disclosed by opposing counsel.

Bailey's counsel cannot find refuge in that last "not disclosed" phrase, because Bailey Final Mem. was of course filed *before* Govt. Final Mem. No justification thus appears for the failure of Bailey's counsel to have disclosed his own *Masters* case to this Court.

And *Masters, id.* then went on to describe the ex post facto contention that was advanced there by the same lawyer who now represents Bailey here:

> Amendment 311, effective November 1, 1990, moved conspiracy to commit murder from § 2A1.1 (on which see Method 1) to a new § 2A1.5. This guideline says that "[i]f the offense resulted in the death of a victim, apply § 2A1.1 (First Degree Murder)." U.S.S.G. § 2A1.5(c)(1). That takes us straight to Method 2 [the one described in the preceding quotation]. Congress provided that courts must apply the guidelines "that are in effect on the date the defendant is sentenced." 18 U.S.C. § 3553(a)(4). Masters was sentenced before amendment 311 but resentenced after its adoption. He contends that the ex post facto clause of the Constitution prevents the court from applying this amendment to him.

Having said that, *Masters, id.* at 284–85 continued its ruling in language that might well have been written for this case (citations omitted, emphasis in original):

> Sidestepping this contention, the district court treated amendment 311 as clarifying rather than changing the law—as demonstrating, in other words, that Method 2 has been the right one all along. Like the district judge, we conclude that Method 2 is proper. Methods 1 and 3 reinforce the result, demonstrating the (rough) internal consistency of the guidelines. Masters insists that the guidelines implement a charge-offense system and observes that he was neither charged with nor convicted of murder. True enough, the Sentencing Commission rejected real-offense sentencing as impractical. The guidelines start with the offense of conviction. But real-offense principles influence not only the aggravating and mitigating factors but also the definition of relevant conduct under § 1B1.3. For example, the guidelines use the full quantity of drugs sold or loot stolen in a single scheme or course of conduct,

not just the amount the prosecutor names in the indictment, to determine the seriousness of an offense.

> Cross-references within the guidelines introduce real-offense principles into the charge-offense system. Section 2E1.1(a)(2), which requires the court to use "the offense level applicable to the underlying racketeering activity," speaks of the underlying racketeering activity," speaks of the underlying *activity* and not an underlying *conviction.* Often there will be no other conviction, and the existence of one in this case does not change the nature of the cross-reference. Section 1B1.3(a)(iii) says that "cross references in Chapter Two ... shall be determined on the basis of the following: (1) all acts and omissions committed and aided or abetted by the defendant ... that occurred during the commission of the offense of conviction." The murder of Dianne Masters occurred during the racketeering conspiracy. So § 2E1.1(a)(2), read from the perspective of § 1B1.3(a), directs the court to the murder guideline rather than the solicitation guideline. At least it does this if the court's finding that Masters is responsible for his wife's murder is sustainable, and the process is otherwise consistent with the Constitution.[10]

Thus Bailey loses either way—whether via *Korando*'s rejection of a comparable ex post facto argument under the November 1, 1990 Guideline or via *Masters'* reading and application of the earlier Guideline under parallel circumstances, which obviates the need to decide the constitutional issue. Hence Bailey's last-minute contention fails from any perspective.

▪ To shift to a different subject that has been raised for the first time by Bailey Final Mem., in a sense perhaps its most startling aspect is what appears to be an odd failure or refusal to recognize Bailey's criminal responsibility for his own acts (*id.* at 6):

---

**10.** [Footnote by this Court] As the rest of the *Masters* opinion reflects, that last reference to the Constitution spoke of the defendant's double jeopardy argument, which was next dispatched by the Court of Appeals. It is also worth noting that *Masters, id.* at 287 approved the application of a preponderance-of-the-evidence test to find that murder had taken place for Guideline purposes, although the jury had not reached that conclusion.

The Defendant did not agree to violate the RICO statute, he agreed to commit mail fraud and wire fraud and launder the proceeds. The joining of the 1977 Brach matter into the web of RICO was a result of the government's action not the Defendant's.

But of course it was not the *government* that solicited Brach's murder—to the extent that the act of solicitation was carried out during and in furtherance of the RICO conspiracy, it was Bailey and not the prosecutors who made the decision to "join[ ] the 1977 Brach matter into the web of RICO." To be sure, Bailey has never *admitted* the Brach-related act, but there is no doubt whatever that he and his counsel knew that the Brach charge was to be the principal focus of the entire sentencing hearing (indeed, even before the hearing Bailey's counsel sought more than once to limit the scope of the hearing to that subject alone, by emphasizing that Bailey had admitted the bulk of the charged fraudulent activity and by asserting that the only subjects that had to be dealt with in evidentiary terms were those that Bailey had challenged—and that meant mainly the Brach subject matter). When the government then succeeded at the hearing in proving its case by the required preponderance of the evidence, that offense automatically became "underlying racketeering activity" for purposes of RICO Guideline § 2E1.1(a)(2).

In that respect Bailey Final Mem. 1–3 begins by emphasizing that RICO Racketeering Act 4 under Count Two charged Bailey with conspiring to commit murder and solicitation to commit murder, not with the murder itself. That of course is accurate. But what Bailey's counsel have glossed over in trying to make something of that—or have really ignored entirely—is the point that has been made both in this Court's earlier Opinion and here: Guideline § 2A1.5(c)(1) specifically states that if the conspiracy or solicitation resulted in the death of a victim, then the *murder* level under Guideline § 2A1.1 is the one that applies. It can scarcely be thought that Bailey's counsel were somehow unaware of that specific linkage—after all, here is what they themselves have said at Bailey Final Mem. 3 (emphasis in original):

> Three years later, in November of 1990, the guidelines were amended to provide that a conspiracy to commit murder carried a base level of 28 and if death occurred there was a level 43 which *required* life imprisonment. (2A1.5)

That recognition underscores the mischaracterization that is implicit in the position now sought to be urged on Bailey's behalf. What the extended sentencing hearing was known from the beginning to involve, and indeed was the ground on which the prosecution and the defense conducted their most pitched battle, was whether or not Richard Bailey had conspired to seek the murder of Helen Vorhees Brach—whether he had in fact solicited that murder.[11] Because the Guideline stakes involved in that dispute were known from the beginning to be those that Bailey's counsel have identified in the just-quoted language from their Final Mem., it is unacceptable for them now to suggest that they did not realize that an affirmative answer to that question—given the timing of the solicitation, followed so swiftly by Brach's otherwise-unexplained disappearance—would give rise to the inference that the causal nexus called for by Guideline § 2A1.5(c)(1) existed, so as to trigger the level 43 standard for murder that is established by Guideline § 2A1.1. This Court has drawn that inference, just as the trial judge did in *Masters.* It is entirely artificial for Bailey's counsel to contend now that they had understood that the nature of Bailey's guilty plea would result in a hearing on the solicitation to murder, but that they had somehow failed to understand the necessary consequence of any decision by this Court that the government had succeeded on that score.

---

11. Indeed, the current profession of surprise by Bailey's counsel is itself even more surprising (and less defensible) than that. As Govt. Final Mem. 1–2 points out:

> [A]ny surprise that the government contended from the outset that the charged conspiracy resulted in Helen Brach's murder could have been avoided by reading the indictment. Count One of the indictment charges that "members of the enterprise engaged in threats of violence and violence, including ... conspiring to murder, soliciting the murder of and *causing the murder of* Helen Brach."

Finally, perhaps the most ironic aspect of the Bailey Final Mem. is its effort to throw this Court's own words in *Kopshever* in its face, with the implication that this Court has contrived the result here. That implication gives rise to sorrow rather than anger, for the irony does not lie in any contrast between the *Kopshever* language and the decision that this Court has reached here, as Bailey's counsel purport to believe. There is no such contrast. Instead the true irony is rather that if this Court had really been result-oriented, rather than conducting an impartial hearing and evaluating the evidence objectively, it would have found a way to reach exactly the opposite result from what it ultimately decided on the Brach-related racketeering act.

This Court finds no satisfaction in holding that Bailey must serve a life sentence rather than the already-substantial term of years that the non-Brach-related offenses would require. If Bailey were required to serve 135 months less earned good time (a net of something a bit less than 10 years of custodial time), he would emerge from custody shortly before his 75th birthday—a time at which it would be difficult to visualize him as remaining a material threat to susceptible American womanhood. If in good conscience this Court could have resolved the factual issue on the Brach matter by finding that the government had failed to satisfy the required preponderance-of-the-evidence standard, this Court would frankly have preferred that result, which would have left Bailey with the hope that he could look forward to a future return to society. It seems hard for Bailey's counsel to face the reality that an objective listener and observer, after considering all of the evidence, has concluded that the preponderance of that evidence calls for the conclusion that Bailey did indeed conspire toward and solicit the murder of Helen Brach.

### Conclusion

Just as in other areas of the law a defendant's prior criminal conduct may enter into, or may even dominate, the sentencing consequences of today's crime, so *Korando* and *Masters* (among other cases) call for the rejection of any argument that the Guidelines calculation by this Court runs afoul of the Ex Post Facto Clause. Nor do any of Bailey's other newly-advanced contentions carry the day. This Court's ruling, as expressed in the Opinion, stands.

### SECOND SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

In part this Court's June 15, 1995 memorandum opinion and order ("Opinion II"), supplementing its June 6 opinion dealing with the sentencing of Richard Bailey ("Bailey"), considered but swiftly rejected the attempted reliance of Bailey's counsel on Third Circuit case law as exemplified by *United States v. Bertoli*, 40 F.3d 1384, 1402–05 (3d Cir.1994)—see Opinion II at 1019 n. 6, 1021–22. *Bertoli* was the most recent of several Third Circuit decisions that had refused to follow the "one-book rule" of Guideline § 1B1.11(b)(2). As Opinion II at 1019 n. 6 pointed out, our own Court of Appeals (*United States v. Boula*, 997 F.2d 263, 266 (7th Cir.1993))—like every Circuit other than the Third to this Court's knowledge—has ruled otherwise by both upholding and applying the one-book rule.

Immediately after issuing Opinion II, however, this Court noted in the current issue of *West's Federal Case News* a current opinion from the Third Circuit that was summarized in a way that appeared to retreat from the case law sought to be relied on by Bailey's counsel. This Court therefore obtained the printout of *United States v. Corrado*, 53 F.3d 620 (3d Cir.1995), and it has verified that *Corrado* does indeed deprive *Bertoli* and the other Third Circuit cases cited in *Bertoli* of any potential value to Bailey.

*Corrado* at 624 has now expressly decided that Guideline § 1B1.11(b)(2) has the force of law and is binding on the federal courts. Thus the Third Circuit has aligned itself with our Court of Appeals (and with all other Circuits, see *Corrado* at 625) in upholding the one-book rule and its requirement that a single Guidelines Manual must be used for all purposes in calculating a defendant's sentence.

But even more significant for purposes of this case is the further aspect of *Corrado*

that rejected an ex post facto contention advanced by the defendant there. Here is what *Corrado, id.* at 625 said on that score:

> The ex post facto clause "forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred." *Weaver v. Graham,* 450 U.S. 24, 30, 101 S.Ct. 960, 965, 67 L.Ed.2d 17 (1981). Significantly, Corrado's sentence was, in fact, imposed pursuant to the law in effect at the time he committed his crimes. Corrado had "fair warning" of the specific punishment prescribed for his crimes, see *Miller v. Florida,* 482 U.S. [423,] 430–431, 107 S.Ct. [2446,] 2451–52 [96 L.Ed.2d 351 (1987)], and of the maximum available reduction for acceptance of responsibility which was two levels. It is true that Corrado could not have predicted that the "one book rule" would have required him to be sentenced under the 1987 version of the guidelines, thus prohibiting him from receiving an additional one-level decrease for acceptance of responsibility. Of course, it is equally true that Corrado could not have forecast that a more favorable provision for acceptance of responsibility might exist in 1993. But the impossibility of prognostication under these circumstances is not at all analogous to "the lack of fair notice" which, from the outset, has been recognized as central to the ex post facto prohibition. See *Miller,* 482 U.S. at 430, 107 S.Ct. at 2451, citing *Weaver,* 450 U.S. at 30, 101 S.Ct. at 965. The ex post facto clause protects defendants from future legislation which "increases punishment beyond what was prescribed when the crime was consummated." *Id.*

That "fair warning" and "fair notice" approach, applied to the Guidelines that are in existence at the time a defendant commits the crime or crimes that determine which "one book" (which Guidelines Manual) is to be used in determining that defendant's Guideline range, of course reflects precisely the analysis that Opinion II articulated throughout its discussion of why Bailey must serve a life sentence here. Bailey, having conspired to seek the murder of Helen Vorhees Brach, and having solicited that murder, must have those acts taken into account in accordance with the Guideline provisions that apply to Bailey's post-November 1, 1990 RICO violations.

Accordingly this further opinion will serve as a supplement to Opinion II, by withdrawing any suggestion that Bailey might draw comfort from Third Circuit law in seeking to persuade our Court of Appeals to depart from its own precedents in the ex post facto field. In this Court's view, no authority now exists in any Circuit that would enable Bailey's counsel to invoke the Ex Post Facto Clause to avoid the sentencing conclusion that this Court has reached.